COURT OF APPEALS OF VIRGINIA

Present: Judges AtLee, Causey and Callins
Argued at Norfolk, Virginia

WESLEY PAUL HADSELL

                                                MEMORANDUM OPINION[*] BY
v.       Record No. 0559-22-1          JUDGE DORIS HENDERSON CAUSEY
                                              MARCH 19, 2024

COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF SOUTHAMPTON COUNTY
L. Wayne Farmer, Judge

(James S. Ellenson, on brief), for appellant. Appellant submitting
on brief.

Victoria Johnson, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.

After a 13-day jury trial, Wesley Hadsell was convicted of first-degree murder and

concealing a dead body.[1] The trial court sentenced Hadsell to life plus 15 years' incarceration on all

convictions. Hadsell contends that the trial court erred in denying his motion to suppress evidence

obtained during a search of his hotel room. He also asserts that the trial court erred in excluding the

victim's journal entries at trial, which he argues violated his constitutional right to present a defense.

In addition, Hadsell argues that the evidence was insufficient to sustain his convictions because it

failed to establish his identity as the perpetrator and that he acted with premeditation. Finally,

Hadsell argues that the trial court erred in denying his motion to set aside the verdict because "the

---

[*] This opinion is not designated for publication. *See* Code § 17.1-413(A).

[1] The trial court dismissed a related charge of felony murder. Upon his guilty plea, the
trial court also convicted Hadsell of an unrelated charge of possessing a Schedule III controlled
substance while a prisoner.

jury's verdict was the product of emotion rather than a dispassionate and reasoned consideration of the evidence." We conclude that the trial court did not err and affirm its judgment.

BACKGROUND[2]

In February 2015, 18-year-old A.J. Hadsell was a student at Longwood University, where she played softball and field hockey. A.J. suffered from migraine headaches, and her neurologist prescribed daily nortriptyline hydrochloride to treat her condition. A.J. had no documented history of suicidal ideation and did not use illicit drugs.

A.J.'s mother, Jennifer Hadsell Wright, lived in a house in Norfolk with A.J.'s two stepsisters: Justice and Gracie Hoffer. Wright was married to Hadsell, who worked for an HVAC company in Norfolk. Wright had asked him to move out of her house because he was using cocaine. Hadsell was living in a nearby hotel. Hadsell admitted to relatives and a co-worker that his cocaine use had caused family "issues," although he maintained that "he would never touch" heroin because that drug had "killed" his friend. A.J. told her boyfriend, Joshua Campbell, that she was upset that Hadsell had prioritized his addiction over her family.

On Friday, February 27, 2015, A.J.'s mother and siblings picked her up from college to stay at the family home during spring break. That weekend, A.J. went shopping with her family and her friend, Andre Barr. Additionally, she had an appointment to see an orthopedist to treat a knee injury on Tuesday, March 3, and planned to go to the gym with Justice afterward. A.J. also intended to see her boyfriend on Wednesday, March 4.

---

[2] On appeal, we review the evidence "in the 'light most favorable' to the Commonwealth, the prevailing party in the trial court." *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022) (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)). Doing so requires us to "discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom." *Cady*, 300 Va. at 329 (quoting *Commonwealth v. Perkins*, 295 Va. 323, 324 (2018)).

Around 7:00 a.m. on Monday, March 2, 2015, A.J. stayed home while her mother and siblings left for work and school. As Wright left, Hadsell called her phone and said that he was going to drive his red Ford F-150 pickup truck to the house and pick up his work van, which was parked outside. Wright told Hadsell to leave the keys to the truck in the mailbox so A.J. could drive it if necessary. Before leaving, Justice made plans to get smoothies with A.J. after school. A.J. had no visible bruises or injuries when her mother and siblings left.

At 7:01 a.m., a surveillance camera at a 7-Eleven store on Halprin Drive recorded Hadsell's truck traveling toward A.J.'s home. At 7:07 a.m., the camera then recorded Hadsell's work van driving away from the house, towards Little Creek Road on Halprin Drive, which intersects Little Creek Road, and is the only route in and out of A.J.'s neighborhood.

Hadsell arrived at work later that morning. Julia Smith, Hadsell's co-worker, noticed that he seemed "fine" until he received a text message from A.J. and became "upset." Around 11:45 a.m., Hadsell told Smith that he was "worried" about A.J. and drove away in his work van to go to lunch. Around 12:16 p.m., the surveillance camera at the 7-Eleven store on Halprin Drive recorded Hadsell's work van traveling toward A.J.'s home. At 1:27 p.m., Hadsell's work van drove past the camera traveling away from the residence. When Hadsell was late returning to work, his supervisor, Steven Bonham, texted and called his cell phone, but Hadsell did not respond. At 2:00 p.m., Hadsell returned to work in his work van and spoke to Smith and Bonham. Hadsell claimed that he met A.J. at a gas station during his lunch break and gave her money. Hadsell, "on the verge of tears," told a co-worker that A.J. had requested "13 or 1,500" dollars and he was "concerned" because that was a "larger" amount than she had asked for in the past. Bonham allowed Hadsell to leave work early.

At 2:30 p.m. on the same day, Justice returned home from school and noticed that the front door was unlocked and her dog was outside. A.J.'s wallet was on the couch in the living

room beside a basket containing partially folded laundry; A.J.'s Bluetooth speaker was also turned on. Justice searched A.J.'s bedroom and learned that some of A.J.'s belongings were missing, including some clothing and a black Vans shoe. A.J.'s cell phone was also gone, but her winter coat was still at the house despite the cold weather outside. Justice also found a pink sticky note on the kitchen table which read, "Dear Madre, with everything that's going on it's a lot to deal with" in A.J.'s handwriting.

Around 2:42 p.m., Hadsell began calling and texting his drug dealer, Damon Harriott.[3] Shortly after midnight on March 3, Hadsell drove his work van to an ATM in Norfolk. A surveillance camera recorded Hadsell repeatedly "looking back" at the van as he withdrew cash from the ATM. Later that morning, Hadsell went to Harriott's apartment in Norfolk and purchased $800 of heroin and cocaine from Harriott.

On March 3, 2015, Wright contacted the Norfolk Police Department and reported that A.J. was missing. The next day, Norfolk Police Detective David Lefleur and Officer Bernadette Duffy went to A.J.'s home to interview witnesses. Hadsell arrived at the house around "lunchtime" and spoke to Detective Lefleur and Officer Duffy. Officer Duffy noticed that Hadsell was "extremely tired," "disheveled," his clothes were dirty, and he appeared "kind of twitchy," which the officer opined was consistent with the use of "cocaine or another narcotic." Hadsell initially told Detective Lefleur that he last saw A.J. around 7:00 a.m. on March 2 when he dropped his truck off at her house; Hadsell then claimed that he did not see A.J. until lunchtime on March 2 when he met her at a "One Stop" gas station near his workplace and "gave her $100." Detective Lefleur later obtained a still photograph from surveillance video from the One Stop gas station and had Hadsell circle the precise location where he claimed to have met

---

[3] At trial, the Commonwealth introduced Hadsell's cell phone records establishing that he placed over 40 attempted voice calls or text messages to Harriott between 2:42 p.m. on March 2, 2015, through 5:22 a.m. on March 3, 2015.

A.J. At trial, the Commonwealth introduced the surveillance video and still photograph, which demonstrated that neither Hadsell, A.J., nor their vehicles appeared at that location on March 2. Hadsell said that A.J. was wearing her Longwood school jacket, gray boots, and yoga pants when he last saw her.

During the interview on March 3, Hadsell also told Detective Lefleur that A.J.'s house had an alarm system that sent a notification to his cell phone whenever a door was opened. Hadsell claimed that around 1:30 p.m. on March 2, he received an alarm notification and assumed that A.J. had returned home from the gas station. Hadsell refused to show Detective Lefleur the notification on his phone, claiming that he could not do so because the phone had "factory reset[]" itself. Hadsell also claimed that he had canceled the alarm service around March 2. At trial, the Commonwealth introduced records from the alarm company establishing that Hadsell's service was canceled in February 2015 for nonpayment.

Before concluding the interview on March 3, Hadsell told Detective Lefleur that he was conducting his own "investigation" and had asked "people" to "look for stuff." He said that he had broken into his nephew's house to search for A.J. but did not find her. Hadsell refused to provide further details regarding his investigation, although he said that police "would find out . . . what he did to someone else." At trial, Detective Lefleur testified that Hadsell repeatedly told police that he suspected A.J.'s ex-boyfriend, Corey French, of wrongdoing. Hadsell also told A.J.'s friends, including Campbell and Barr, to "keep an eye" on French.

On March 5, 2015, French found a piece of a debit card bearing A.J.'s name on Halprin Drive, along the route French typically walked to work. Soon thereafter, Norfolk Police Detective Brandon Shum arrived at the scene in response to French's reported discovery. The detective collected the torn debit card, and French showed him where he found it. Detective Shum and French searched the area for additional pieces of the debit card but found none.

Later that day, A.J.'s boyfriend, Campbell, visited French's home. French lived in his mother's house on Halprin Drive, where he slept on a couch in the living room. While French was taking a shower, Campbell walked through the home and did not see any of A.J.'s belongings. Later that evening, Hadsell called Campbell and questioned him regarding the layout of French's home and whether it had an alarm system. Hadsell told Campbell that he was at French's house and was "possibly going to go" inside.

On March 6, 2015, Hadsell organized a group of A.J.'s friends, including French and Campbell, to search for additional pieces of A.J.'s debit card. A.J.'s friends searched the area where French had previously discovered the torn debit card and found three more pieces. When Hadsell informed Detective Shum about the discovery that afternoon, he said that French was "obsess[ed] with" A.J. and police needed to investigate him.

Later that afternoon, Hadsell and his neighbor, off-duty Norfolk Police Officer Paul Lopez, met Barr at A.J.'s house. Hadsell said that he had broken into French's house and found A.J.'s Longwood jacket underneath a couch cushion. Hadsell claimed that he needed Barr to confirm that the jacket was there so it would be admissible in court. At Hadsell's direction, Barr went with two friends to French's house that evening and found A.J.'s jacket where Hadsell said it would be. After Barr returned to A.J.'s house and reported that he had found the jacket, Hadsell had Officer Lopez drive Barr to the police precinct. Barr told police that he found A.J.'s jacket in French's house, but he did not mention Hadsell's involvement. At trial, Barr testified that he did so because Hadsell had previously threatened him that anyone who disputed whether he had found A.J.'s jacket in French's house "would be dealt with."

On the night of March 6, police searched French's home and seized A.J.'s jacket that was underneath the couch cushion. Police interrogated French, who gave his cell phone to police,

provided a DNA sample, and submitted to a polygraph examination. Denying wrongdoing, French said that he did not own a car and relied on others for transportation.

On March 8, 2015, Barr and one of A.J.'s cousins visited Hadsell in his hotel room. Hadsell showed them a bag and said that it contained two guns; he also placed ammunition inside a vent in his room. Hadsell claimed that he was a member of "Aryan Brotherhood" and told Barr to search his name on the internet; when Barr did so, he found that Hadsell had been previously charged with kidnapping and robbery. Hadsell said that he "had a whole plan to get rid of Corey French" and that he had told his friend, Marilyn Wells, "to rent a truck for him using cash so he would have a getaway car." At some point, Hadsell also told Barr that a "body of water would be the perfect plan to dump a body" because "[i]t would get rid of all evidence."

Wells testified at trial that during the first week after A.J.'s disappearance, Hadsell asked her to rent a truck for him under her name so that he could do his own "investigation." Hadsell offered to repay her in cash because he did not want to create a "paper trail." Wells went to a car rental company with Hadsell, but he abandoned the plan because the company did not have any trucks or SUVs in stock.

On March 12, 2015, Hadsell visited A.J.'s neighbor, Teresa Thomas, and her daughter to request information about A.J.'s missing phone. Describing his "investigation," Hadsell said that he had broken into fourteen vacant houses and sprayed them with luminol "looking for a crime scene." In addition, Hadsell said that he had broken into French's house and found evidence that he could not discuss. Hadsell also claimed that he had obtained video from his neighbors' surveillance cameras that depicted A.J. "driving back from Rite Aid or 7-Eleven" and being followed by a white car on March 2. Hadsell said that he would not share the video with police until he felt that "they [were] struggling enough."

On March 13, 2015, Hadsell organized a search for A.J.'s missing cell phone. Hadsell called Detective Shum and said that he had received a tip that the phone was in a field at the I-64 interchange near Thole Street and Tidewater Drive in Norfolk. Hadsell refused to identify the source of his information. When Detective Shum arrived in the area, he noticed that the news media were present. The detective also noticed that while everyone else "spread out" to search for the phone, Hadsell "went directly to a spot with tall grass and stayed in [a] 10-by-10 grid the entire time." No one found a cell phone during the search. At trial, Thomas testified that she was present and saw a reporter interview Hadsell. According to her testimony, Hadsell "cried and cried and cried" during the interview; but "[a]s soon as the cameras shut off[,]" Hadsell was "laughing and giggling and proud[.]"

FBI Special Agent Joshua Hathaway subsequently discovered that Taylor Carraway, a Norfolk resident who did not know A.J. or her family, had found A.J.'s cell phone on March 5. Carraway told police that he inadvertently found the phone while searching for his own. At the time, Carraway was unaware that the phone was A.J.'s, so he took it home for safekeeping. A.J.'s phone was "password protected" and inaccessible. Carraway gave A.J.'s phone to Agent Hathaway and accompanied him to the field at the intersection of Tidewater Drive and Thole Street, where he identified the spot where he found it.

On March 20, 2015, Hadsell told Barr that he received another tip from an anonymous caller that there was suspicious clothing beside Battlefield Boulevard in Chesapeake. Hadsell drove Barr and his friend, Collin Saunders, to the area. At trial, Barr testified that although Hadsell was driving "erratically," Hadsell "suddenly" claimed to see "clothes on the side of the road." When they stopped and searched the area, Barr and Saunders found A.J.'s softball shorts, knee brace, and her missing black Vans shoe. Hadsell called police and reported the discovery.

Later that night, Detective David Benjamin conducted a video-recorded interview of Hadsell at the police precinct. Hadsell said that he received the tip regarding A.J.'s missing clothing at 5:02 p.m. on March 19 during "a telephone call from a blocked number." When the detective asked to see Hadsell's call history, Hadsell claimed that he deleted it to "free up the phone memory." At trial, the Commonwealth introduced Hadsell's cell phone records, which established that there was no record of such a call. The Commonwealth also introduced A.J.'s cell phone records demonstrating that her cell phone and Hadsell's cell phone were both in the area of Hadsell's hotel room "on the afternoon of March 2" and "into the morning of March 3." Confronted with those records during the interview, Hadsell denied that he "hurt or murdered" A.J. and claimed that he did not know where she was. When Detective Benjamin left Hadsell alone in the interview room, Hadsell said to himself, "I'm screwed."

At 6:00 p.m. on March 20, 2015, police executed search warrants for Hadsell's hotel room and work van. In the hotel room, officers seized Hadsell's laptop and searched its internet browser history. At 9:42 p.m. on March 11, Hadsell searched for maps of the intersection where A.J.'s cell phone was found. Police also found a box of ammunition in the air vent. In addition, police found a sandwich bag containing approximately 0.0426 grams of heroin hidden in a wooden box.[4] Sarah L. Platts, an expert in "dog handling" and "detection of human remains," searched Hadsell's hotel room with a dog trained to detect the odor of human decomposition. The dog alerted on a spot of carpet beside the bed.

In Hadsell's work van, police found a "Garmin Nuvi" GPS navigation device that was "mounted to the dash[board]" of the van. Hadsell admitted that he used the GPS device to navigate to various job sites, including one in Franklin, Virginia.

---

[4] At trial, Hadsell's drug dealer, Harriott, testified that he packaged heroin for sale in clear plastic sandwich bags. Harriott testified that the packaging of the heroin police found in Hadsell's hotel room was consistent with the way Harriott packaged heroin.

At trial, FBI Agent Albert Sena testified as an expert in "digital and data management" analysis that he reviewed geolocation data from Hadsell's GPS device. Agent Sena found that there was no GPS data for March 2, 2015, and very limited data for March 3, 2015, which he opined was consistent with either "the GPS being turned off," "having no power," or "not being moved" during that time. Nevertheless, there was significant GPS data for March 4. Around 7:15 a.m. on March 4, 2015, Hadsell's GPS device was at the intersection of I-64 and I-264 in Norfolk and traveled toward Suffolk, Virginia. At 7:25 a.m., Hadsell stopped at a 7-Eleven in Suffolk and made a purchase. At 8:30 a.m. that day, the GPS device was at a Citgo gas station in Franklin, Virginia. Shortly thereafter, one of Hadsell's credit cards was used at the gas station. Hadsell's GPS device then traveled south until about 11:52 a.m., it stopped in the driveway of an abandoned house on Smiths Ferry Road, near the North Carolina border. The device then moved behind the house and remained there until 12:14 p.m. At 12:26 p.m., Hadsell's company credit card was used to purchase fuel at a gas station about 4.5 miles from the abandoned house.

On April 9, 2015, police found A.J.'s body lying in a watery drainage ditch behind a shed on the abandoned property on Smiths Ferry Road. Her body was partially buried and covered by a piece of plywood. She was wearing the clothing Hadsell had described, although her pants were pulled down and her buttocks region was exposed.

On April 14, 2015, Platts had her trained cadaver dog search a blue Dodge Caravan that Wright's ex-husband, Zachary Hoffer, used for work. The dog alerted on an area inside the Dodge. Police searched the vehicle and found a pair of work gloves that had Hoffer's blood on them. At trial, Platts testified that the dog was trained to alert to the scent of human blood, in addition to decomposing human remains. According to Platts, if someone left a pair of bloody gloves in a van, her dog would alert to it. At trial, Hoffer denied transporting a dead body in the

Dodge.  He explained that it was likely that his blood was on the work gloves found in the Dodge because he often injured himself on his job.

Detective Benjamin testified that he obtained Hoffer's cell phone records and work schedule spanning the timeframe that A.J. was missing.  The detective opined that, except for a period between 11:05 a.m. to 1:45 p.m. on March 2, 2015, the records established that Hoffer was either at work in Chesapeake or at his home in Norfolk.  Detective Benjamin explained that although there was a "gap in the electronic record," "the bulk of that time" was when Hadsell claimed that he was with A.J.  Moreover, the detective compared geolocation data from Hoffer's and A.J.'s cell phones and determined that the two phones did not "co-locate" during the time that A.J. was missing.[5]

Chief Medical Examiner Dr. Wendy Gunther, an expert in forensic pathology, opined that A.J. died from "acute heroin poisoning."  Dr. Gunther acknowledged that she could not determine exactly when A.J. died.  She further opined that due to A.J.'s extensive decomposition, it was impossible to test the body for signs of sexual activity.  Nevertheless, Dr. Gunther explained that decomposition fluid from A.J.'s chest contained heroin metabolites, including "a combination of codeine, morphine, [and] 6-Acetylmorphine."  "[T]he amount of morphine [was] 0.63 milligrams per liter," triple the amount likely to cause death.  In addition, hair follicle testing established that A.J. had not used heroin or other illicit substances during the "several months" preceding her death.

Dr. Gunther further opined that A.J.'s body had signs of traumatic injury to the neck muscles that were "typical of inflicted asphyxia."  According to Dr. Gunther, A.J. had "control" injuries to her chest, neck, right wrist, and left arm that "could have been" caused by "a person

_____

[5] Detective Benjamin also testified that he obtained cell phone records for French, Campbell, and Barr.  The detective testified that A.J.'s phone did not "co-locate" with the phones belonging to French, Campbell, or Barr during the time that she was missing.

kneeling on her chest and holding her neck." A.J.'s body also had two black eyes, which further "suggested" that A.J. sustained "unspecified criminal violence" before she died from heroin poisoning. Dr. Gunther opined that those injuries were inconsistent with suicide. That A.J. may have been taking different prescription medications[6] around the time of her death did not change that conclusion.

At the conclusion of the Commonwealth's case-in-chief, Hadsell moved to strike the murder charges, arguing that the evidence was insufficient to prove that he was the perpetrator. The trial court denied the motion.

Jeffrey Wieberdink, Wright's neighbor, testified for the defense that at about 12:30 p.m. on March 2, 2015, he noticed a "small compact car" parked in Wright's driveway, although he did not know when it arrived or how long it stayed there. He could not describe the car in greater detail because he only saw it in his "peripheral vision." Wieberdink also testified that he installed security cameras on his property on March 6, 2015. During the police investigation, Hadsell asked Wieberdink to "turn off" the cameras, but he refused to do so.

Dustin Brinkley, another neighbor, testified that at about 2:00 p.m. on March 2, 2015, he saw A.J. drive past him in a red Ford pickup truck near a 7-Eleven in Norfolk. On cross-examination, Brinkley acknowledged that he was uncertain of the exact date when he saw A.J. driving the truck. In rebuttal, FBI Agent Wendell Cosenza testified that he obtained Brinkley's cell phone records and determined that Brinkley was in Virginia Beach, not Norfolk, during the time Brinkley claimed he saw A.J. on March 2.

---

[6] At trial, Dr. Ralph Northam, A.J.'s treating physician, testified as an expert in the field of neurology and the treatment of neurological conditions that A.J. had no history of suicidal ideation, the nortriptyline hydrochloride he prescribed A.J. did not cause depression, and missing a dose of that medication was not dangerous.

Willie Whitehead testified that he lived beside the abandoned house where A.J.'s body was found. He said that at about 3:30 a.m. one day about one or two weeks before police found A.J.'s body, he saw a "dark colored" Dodge Caravan drive "slow[ly] in front" of the abandoned house, park, and turn off its headlights. On cross-examination, Whitehead admitted that he had a "really bad memory" and could not "recall the actual timeframe" of when he saw the vehicle arrive at the residence.

At the conclusion of the evidence, Hadsell renewed his motion to strike the murder charges. The trial court denied the motion in relevant part. After the close of the evidence and argument by counsel, the jury deliberated for 40 minutes before convicting Hadsell of first-degree murder and concealing a dead body. At the sentencing hearing, Hadsell moved to set aside the verdict, arguing that the evidence was insufficient to prove that he acted with premeditation because he was "stoned out of his mind on cocaine and heroin." Hadsell also argued that, based on the jury's short deliberation, it was "obvious" that "[t]hey did not review or consider any of the exhibits" and "decided this case on emotion alone." The trial court found that nothing in the record indicated that Hadsell was "so intoxicated that [he was] unable to develop the specific intent or premeditation required . . . ." The trial court noted that "everything about the defendant's conduct . . . was deliberate, calculated and not indicative of someone who was unable to develop an intent or premeditate an act." Continuing, the trial judge stated that he never observed a more attentive jury and "had no doubt" that they carefully considered the evidence. The trial court held that the length of jury deliberations was "irrelevant" and that the evidence of guilt was overwhelming. Accordingly, the trial court denied the motion to set aside the verdict. Hadsell appeals.

ANALYSIS

I. Motion to Suppress

Before trial, Hadsell moved to suppress the evidence police seized during the March 20, 2015 search of his hotel room, arguing that the search warrant was invalid because it was supported by "a number of false statements." Hadsell attached his own affidavit to his written motion, asserting that police knowingly induced the magistrate to issue the warrant based on false information. In its written response, the Commonwealth countered that the search warrant affidavit would be sufficient to find probable cause even if the trial court discarded the allegedly false statements and "insert[ed] omissions [Hadsell] claims are [in the warrant affidavit]." On January 27, 2020, the trial court heard evidence and argument on the motion, which it denied by order dated February 14, 2020.

On appeal, Hadsell contends that the trial court erred in denying the motion to suppress because the search warrant issued was based on false statements. We do not reach the merits of Hadsell's argument because he failed to file the transcript of the suppression hearing or a written statement of facts in lieu of the transcript necessary for our review.

"[A]n appellate court's review of the case is limited to the record on appeal." *Wilkins v. Commonwealth*, 64 Va. App. 711, 717 (2015) (alteration in original) (quoting *Turner v. Commonwealth*, 2 Va. App. 96, 99 (1986)), *aff'd*, 292 Va. 2 (2016). "It is appellant's burden to provide this Court with a record from which it can decide the issues in the case." *Clarke v. Commonwealth*, 60 Va. App. 190, 199 (2012). "In the absence [of a sufficient record], we will not consider the point." *Robinson v. Robinson*, 50 Va. App. 189, 197 (2007) (alteration in original) (quoting *Jenkins v. Winchester Dep't of Soc. Servs.*, 12 Va. App. 1178, 1185 (1991)).

If "the transcript [or statement of facts] is indispensable to the determination of the case, then the requirements for making the transcript [or statement of facts] a part of the record on

- 14 -

appeal must be strictly adhered to." *Bay v. Commonwealth*, 60 Va. App. 520, 528 (2012) (alterations in original) (quoting *Turner*, 2 Va. App. at 99). "This Court has no authority to make exceptions to the filing requirements set out in the Rules." *Shiembob v. Shiembob*, 55 Va. App. 234, 246 (2009) (quoting *Turner*, 2 Va. App. at 99). "When the appellant fails to ensure that the record contains transcripts or a written statement of facts necessary to permit resolution of appellate issues, any assignments of error affected by such omission will not be considered." Rule 5A:8(b)(4)(ii).

Here, Hadsell did not file a transcript of the suppression hearing, or a statement of facts in lieu of the transcript, in the trial court to make them a part of the appellate record. *See* Rule 5A:8(a). As Hadsell challenges the trial court's denial of his motion to suppress, a timely-filed transcript of the trial proceedings wherein the evidence was introduced, or a written statement of facts in lieu of a transcript, is indispensable to resolving Hadsell's assignment of error. *See Smith v. Commonwealth*, 56 Va. App. 351, 353-54 (2010) (declining to address defendant's Fourth Amendment challenge on appeal because a timely-filed transcript of the suppression hearing was indispensable to resolving the issue), *aff'd*, 281 Va. 464 (2011).

We reject Hadsell's assertion that "the pleadings, proffered affidavits, and order" denying his suppression motion "are adequate to permit the appellate court to review the trial court's decision." This Court cannot consider evidence that an appellant "failed to submit to the trial court." *John v. Im*, 263 Va. 315, 320 (2002); Rule 5A:10. Hadsell's pleadings are not evidence, and there is no record that he introduced the search warrant affidavit or his own affidavit into evidence at the suppression hearing. *Cf. Boyd v. County of Henrico*, 42 Va. App. 495, 505 n.4 (2004) (holding that opposing counsel's statements referenced in appellate brief were not part of the evidentiary record on appeal where they were not reflected in the trial transcript). Nor is there a record of the basis of the trial court's holding. Thus, Hadsell failed to present a sufficient

record from which this Court may determine whether the trial court erred. Accordingly, his assignment of error is waived, and "we will not consider the point." *Robinson*, 50 Va. App. at 197 (quoting *Jenkins*, 12 Va. App. at 1185).

## II. Motion to Admit Evidence

Before trial, the Commonwealth moved to exclude certain entries from A.J.'s journal as inadmissible hearsay. The journal entries contained A.J.'s poetry and a letter addressed to her boyfriend, Campbell, discussing their relationship. The Commonwealth argued that the journal entries had "no date or time stamp" and it was "unknown if these entries were made days, weeks, months, or years before the victim's murder." Following argument on the motions,[7] the trial court held that the undated journal entries did not satisfy the state-of-mind exception to the rule against hearsay.

During trial, Hadsell asked the trial court to revisit its pretrial ruling. Although he initially argued that the journal entries were admissible to establish that A.J. was depressed and contemplating suicide before her death, Hadsell ultimately conceded that the entries were inadmissible and withdrew his attempt to introduce them into evidence. Hadsell did not raise any constitutional argument.

On appeal, Hadsell contends that the trial court's ruling excluding the journal entries violated his "constitutional right to call forth this evidence in his favor" because the evidence was necessary to establish that A.J. intended to kill herself.

We do not consider the merits of Hadsell's constitutional argument because to do so would allow him to approbate and reprobate. The Supreme Court has held that "[a] party may not approbate and reprobate by taking successive positions in the course of litigation that are

---

[7] The record does not contain a transcript of the pretrial hearings on the Commonwealth's motion *in limine*.

- 16 -

either inconsistent with each other or mutually contradictory." *Nelson v. Commonwealth*, 71 Va. App. 397, 403 (2020) (alteration in original) (quoting *Rowe v. Commonwealth*, 277 Va. 495, 502 (2009)). Here, the record establishes that Hadsell conceded at trial that A.J.'s journal entries were inadmissible. Accordingly, the approbate and reprobate doctrine bars our review of the merits of Hadsell's constitutional argument. *See Nelson*, 71 Va. App. at 404 (holding defendant approbated and reprobated by initially conceding that the trial court lacked jurisdiction to consider a motion but argued on appeal that the trial court erred in accepting that concession).

### III. Sufficiency of the Evidence

"When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (alteration in original) (quoting *Smith v. Commonwealth*, 296 Va. 450, 460 (2018)). "In such cases, '[t]he Court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Id.* (alteration in original) (quoting *Secret v. Commonwealth*, 296 Va. 204, 228 (2018)). "Rather, the relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Vasquez v. Commonwealth*, 291 Va. 232, 248 (2016) (quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *McGowan*, 72 Va. App. at 521 (quoting *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018)).

#### a. Identity

Hadsell argues that the evidence was insufficient to prove that he "was the person who murdered [A.J.] or the person who buried her body" because "the Commonwealth failed to

- 17 -

exclude the hypothesis of innocence that someone other than [him] abducted and killed" A.J. We disagree because the evidence of Hadsell's guilt is overwhelming: (1) cell phone records show that Hadsell and A.J.'s phones were in the same location on the day she went missing; (2) evidence contradicts Hadsell's statements about his whereabouts on that same day; (3) Hadsell's GPS traveled to the location where A.J.'s body was found—before it was found; and (4) evidence suggests that Hadsell planted items belonging to A.J. to frame others, among other evidence.

"At trial, the Commonwealth bears the burden of proving the identity of the accused as the perpetrator beyond a reasonable doubt." *Cuffee v. Commonwealth*, 61 Va. App. 353, 364 (2013) (quoting *Blevins v. Commonwealth*, 40 Va. App. 412, 423 (2003)). As with any element of an offense, identity may be proved by direct or circumstantial evidence. *Crawley v. Commonwealth*, 29 Va. App. 372, 375 (1999). "Circumstantial evidence is as competent and is entitled to as much weight as direct evidence, provided it is sufficiently convincing to exclude every reasonable hypothesis except that of guilt." *Holloway v. Commonwealth*, 57 Va. App. 658, 665 (2011) (en banc) (quoting *Coleman v. Commonwealth*, 226 Va. 31, 53 (1983)). "[C]ircumstantial evidence is not viewed in isolation." *Id.* (quoting *Commonwealth v. Hudson*, 265 Va. 505, 514 (2003)). "While no single piece of evidence may be sufficient, the combined force of many concurrent and related circumstances . . . may lead a reasonable mind irresistibly to a conclusion." *Pijor v. Commonwealth*, 294 Va. 502, 512-13 (2017) (alteration in original) (quoting *Muhammad v. Commonwealth*, 269 Va. 451, 479 (2005)). Moreover, "[b]y finding the defendant guilty, . . . the factfinder 'has found by a process of elimination that the evidence does not contain a reasonable theory of innocence.'" *James v. Commonwealth*, 53 Va. App. 671, 681 (2009) (quoting *Haskins v. Commonwealth*, 44 Va. App. 1, 9 (2004)). That conclusion "is itself a 'question of fact,' subject to deferential appellate review." *Id.*

A reasonable fact finder could conclude that Hadsell was the perpetrator of A.J.'s murder based on the overwhelming evidence establishing his opportunity to commit the murder, the cell phone location data demonstrating that he was with A.J. while she was missing, his unexplained location at the abandoned property where A.J.'s body was found, his efforts to conceal his criminal involvement and frame French as the perpetrator, and his false statements to police. First, the evidence established that Hadsell was the last person to see A.J. before her disappearance on March 2, 2015. Hadsell admitted to police that he saw A.J. at around 7:00 a.m. on March 2 when he picked up his work van from her house. When Hadsell went to work later that morning, Hadsell's co-workers noticed that he became "upset" after receiving a text message from A.J. Around 11:45 a.m., Hadsell said that he was "worried" about A.J. and left in his work van. While he was supposedly at lunch, surveillance cameras recorded Hadsell's work van driving toward A.J.'s house at 12:16 p.m. and driving away from her residence at 1:27 p.m. At trial, Hadsell's supervisor testified that Hadsell was gone from work for an unusually long time and did not respond to calls and text messages. When Hadsell returned in his work van at 2:00 p.m., he was distraught and left work early. Hadsell then frantically called his drug dealer and purchased $800 of cocaine and heroin the next day, despite Hadsell's claim that he did not use heroin because of its lethality.

Additionally, cell phone records established that during the afternoon on March 2 through the early morning of March 3, while A.J. was missing, Hadsell and A.J.'s cell phones traveled together. Geolocation data from Hadsell's GPS unit established that on March 4, Hadsell's work van traveled to the abandoned house in Franklin, Virginia, where police ultimately found A.J.'s remains. At trial, Dr. Gunther opined that A.J. had sustained injuries from violent restraint and died from heroin poisoning. From this evidence, the jury could infer that Hadsell abducted A.J. in his work van during his "lunch break" on March 2, purchased heroin and used it to poison A.J.

to death on March 3, and then hid her body at the abandoned house in Franklin on March 4 to avoid detection. *Cf. Edwards v. Commonwealth*, 68 Va. App. 284, 299 (2017) (affirming first-degree murder conviction where defendant's cell tower location records established his presence at the crime scene at the time of victim's murder).

Although Hadsell claimed that he met A.J. at the One Stop gas station on March 2 to give her money, gas station surveillance video proved that he did not do so. Records from his alarm company also contradicted his claim that he received an alert on his phone indicating that A.J. had returned home after their supposed meeting at the gas station. Considering that evidence, the jury was entitled to discount Hadsell's self-serving denial that he "hurt or murdered" as "little more than lying to 'conceal his guilt,' and could treat such prevarications as 'affirmative evidence of guilt.'" *Coleman v. Commonwealth*, 52 Va. App. 19, 25 (2008) (first quoting *Haskins*, 44 Va. App. at 10; and then quoting *Wright v. West*, 505 U.S. 277, 296 (1992)).

Moreover, the jury could infer that Hadsell planted evidence—including A.J.'s cell phone, jacket, torn debit card, and clothing— to suggest that French had murdered A.J. *See Palmer v. Commonwealth*, 14 Va. App. 346, 348-49 (1992) ("[I]t is today universally conceded that the fact of an accused's flight, escape from custody, resistance to arrest, concealment, assumption of a false name, and *related conduct* are admissible as evidence of consciousness of guilt, and thus of guilt itself." (alteration in original) (emphasis added)). Hadsell repeatedly told police and A.J.'s friends to "keep an eye" on French and admitted to breaking into French's home, where Hadsell claimed to have discovered A.J.'s missing Longwood jacket. Hadsell also called police after French found fragments of A.J.'s debit card along the route French regularly walked to work. Indeed, Hadsell admitted to Barr that he "had a whole plan to get rid of Corey French" and had arranged for a friend "to rent a truck for him using cash so he would have a

getaway car." At some point, Hadsell even said that a "body of water would be the perfect plan to dump a body" because "[i]t would get rid of all evidence."

In sum, the record supports the jury's finding that Hadsell was the perpetrator of A.J.'s murder. The jury considered the totality of the evidence and properly rejected Hadsell's theory of innocence that French or another suspect murdered A.J. Accordingly, we uphold the trial court's judgment.[8]

b. Premeditation

Hadsell contends that the evidence was insufficient to prove first-degree murder because he "was so greatly intoxicated with cocaine and heroin as to be incapable of deliberation or premeditation," which "negated the specific intent requisite for a conviction of first-degree murder[.]" We disagree because Hadsell's conduct immediately before and after A.J.'s murder shows that Hadsell's mind was operating in a deliberate and logical manner.

"To premeditate means to adopt a specific intent to kill, and that is what distinguishes first and second degree murder." *Kirby v. Commonwealth*, 50 Va. App. 691, 700 (2007) (quoting *Remington v. Commonwealth*, 262 Va. 333, 352 (2001)); *see also* Code § 18.2-32. "The intention to kill need not exist for any specified length of time prior to the actual killing; the design to kill may be formed only a moment before the fatal act is committed provided the accused had time to think and did intend to kill." *Avent v. Commonwealth*, 279 Va. 175, 208 (2010) (quoting *Remington*, 262 Va. at 352). "[I]t is necessary that the killing should have been done on purpose, and not by accident, or without design." *Aldridge v. Commonwealth*, 44 Va. App. 618, 655 (2004) (quoting *Epperly v. Commonwealth*, 224 Va. 214, 231 (1982)).

---

[8] Hadsell waived his argument that the evidence was insufficient to prove that he perpetrated the concealment of A.J.'s dead body because he did not raise that argument in the trial court. Rule 5A:18. Hadsell does not invoke the ends of justice or good cause exceptions to Rule 5A:18 in his opening brief, and we will not do so sua sponte. *Edwards v. Commonwealth*, 41 Va. App. 752, 761 (2003) (en banc).

Whether a defendant committed a "willful, deliberate, and premeditated" killing is a question of fact for the jury to determine. *Epperly*, 224 Va. at 231-32.

Factors relevant in determining premeditation may include "the brutality of the attack," "whether more than one blow was struck, the disparity in size and strength between the defendant and the victim, the *concealment of the victim's body, and the defendant's lack of remorse and efforts to avoid detection*." *Avent*, 279 Va. at 208 (emphasis added) (quoting *Epperly*, 224 Va. at 232). "Taking the steps necessary to locate and obtain a weapon further bolsters the inference of malice." *Morris v. Commonwealth*, 17 Va. App. 575, 578 (1994). The existence of each of these circumstances, however, is not required before a jury may find that premeditation existed. *Rhodes v. Commonwealth*, 238 Va. 480, 487 (1989). Rather, "any one of these circumstances standing alone might [be] sufficient" in a given case. *Kirby*, 50 Va. App. at 702.

"We have said that '[a] person who voluntarily has become so intoxicated as to be unable to deliberate and premeditate cannot commit any class of murder that is defined as a wil[l]ful, deliberate and premeditated killing.'" *Lawlor v. Commonwealth*, 285 Va. 187, 230 (2013) (first alteration in original) (quoting *Giarratano v. Commonwealth*, 220 Va. 1064, 1073 (1980)). "However, proof of mere intoxication is insufficient; the defendant must establish intoxication so great it rendered him incapable of premeditation." *Id.* Thus, we have held that the evidence was sufficient to establish that a defendant acted with premeditation even though he was "high" on drugs where his "conduct immediately before and after the capital homicide" demonstrated that his "mind was nevertheless operating in a logical, deliberate, evil and sinister fashion." *Giarratano*, 220 Va. at 1073.

Here, even assuming that Hadsell was under the influence of cocaine or another narcotic when he murdered A.J., Hadsell's "conduct immediately before and after" A.J.'s murder "belie

his claim of mental incapacity induced by drugs[.]" *Id.* The record established that on March 2, 2015, Hadsell traveled to A.J.'s house, retrieved his work van, and drove to work. Under the pretense of taking a "lunch break," Hadsell then left work and *returned* to A.J.'s residence. When he returned to work about two hours later, Hadsell falsely claimed that he had met A.J. at a gas station during lunch and asked to leave work early because he was upset. Hadsell then took "the steps necessary to locate and obtain a weapon" by purchasing heroin, a drug which Hadsell claimed not to consume because it had "killed" his friend. *Morris*, 17 Va. App. at 578. Phone and GPS geolocation records demonstrated that Hadsell subsequently drove to the abandoned house where A.J.'s remains were found in a watery drainage ditch, which was consistent with Hadsell's admission that a "body of water would be the perfect plan to dump a body" because "[i]t would get rid of all evidence." During the ensuing police investigation, Hadsell repeatedly misled police, threatened witnesses, and manipulated evidence to cast suspicion on alternative suspects. *See Avent*, 279 Va. at 208 (noting that "the concealment of the victim's body, and the defendant's lack of remorse and efforts to avoid detection" are factors that may establish premeditation (quoting *Epperly*, 224 Va. at 232)). Although Hadsell may have been "high" when he killed A.J., his "conduct immediately before and after" doing so demonstrated that his "mind was nevertheless operating in a logical, deliberate, evil and sinister fashion." *Giarratano*, 220 Va. at 1073. Accordingly, the trial court did not err in finding that the evidence was sufficient to prove that Hadsell acted with premeditation.

IV. Motion to Set Aside the Verdict

Motions to set aside the verdict based on error committed during trial are reviewed for abuse of discretion. *Whittington v. Commonwealth*, 5 Va. App. 212, 215 (1987). "Only when reasonable jurists could not differ can [an appellate court] say an abuse of discretion has

- 23 -

occurred." *Grattan v. Commonwealth*, 278 Va. 602, 620 (2009) (quoting *Thomas v. Commonwealth*, 44 Va. App. 741, 753, *adopted upon reh'g en banc*, 45 Va. App. 811 (2005)).

Hadsell argues that the trial court erred in denying his motion to set aside the verdict because "it appeared from the jury's failure to examine any of the hundred plus exhibits and the extremely short time it took to render a verdict" that "the jury's verdict was the product of emotion rather than a dispassionate and reasoned consideration of the evidence." Hadsell's argument is meritless because there is no evidence that the jury did not consider all the evidence and, in fact, a short deliberation can indicate a jury's lack of uncertainty in its verdict.

First, nothing in the record supports Hadsell's contention that the jury did not consider all the evidence presented at trial. To the contrary, the trial judge expressly found that the jury in this case was exceptionally attentive and he "ha[d] no doubt" that they carefully considered the evidence. Second, juries are not required to deliberate for any specific amount of time. *See, e.g.*, *Waye v. Commonwealth*, 219 Va. 683, 702 (1979) (holding that "the mere fact that the jury deliberated no more than 25 minutes provide[d] no indication that it did not maturely, carefully, and calmly deliberate the full range of issues"). We have held that the brevity of a jury's deliberation may indicate that the jury "labored under no uncertainty concerning" the proper verdict. *Id.* Here, given the overwhelming evidence of Hadsell's guilt, it is unsurprising that the jury returned a guilty verdict so quickly. Accordingly, the trial court did not error in denying Hadsell's motion to set aside the verdict on that basis.

CONCLUSION

For the above reasons, we hold that (1) the trial court did not err in denying Hadsell's pretrial motion or granting the Commonwealth's motion *in limine* to exclude the journal entries; (2) there is overwhelming evidence that Hadsell was the perpetrator; (3) there is sufficient

evidence that Hadsell acted with premeditation; and (4) the trial court did not err in denying

Hadsell's motion to set aside the verdict.

*Affirmed.*