## Richmond

## JOSEPH M. GIARRATANO

### v.

## COMMONWEALTH OF VIRGINIA

April 18, 1980.

Record No. 791619.

Present: All the Justices.

*Albert D. Alberi (Alberi & Haskins, P.C.*, on brief), for appellant.
*Robert E. Bradenham, II, Assistant Attorney General (Marshall Coleman, Attorney General,* on brief), for appellee.

COMPTON, J., delivered the opinion of the Court.

During the course of this automatic review of a sentence to death, we must determine whether the evidence was sufficient to convict. Also, we must decide whether the death penalty was imposed arbitrarily and was excessive or disproportionate to the sentence levied in similar cases.

On February 4, 1979, Michelle Kline, age 15, and her mother, Barbara Ann (Toni) Kline, age 44, were murdered in their apartment in Norfolk. The daughter was also raped. Three days later defendant, Joseph M. Giarratano, age 21, was indicted for rape of the daughter, Code § 18.2-61; statutory burglary, Code § 18.2-90; capital murder of the daughter, Code § 18.2-31(e); and murder of the mother, Code § 18.2-32.

The court below, sitting without a jury, proceeded according to the relevant statutes governing trial of capital cases. Defendant pleaded not guilty by reason of insanity to each indictment. Upon conclusion of the Commonwealth's case-in-chief on the issue of guilt or innocence heard on May 22, 1979, the defendant's motion to strike the evidence on the burglary charge was sustained. Upon conclusion of all the evidence relating to criminal responsibility, defendant was found not guilty of statutory burglary but guilty of rape, capital murder, and murder in the first degree.

Subsequently, in sentencing hearings held on August 7 and 13, 1979, after preparation of a probation officer's report, the trial court considered additional evidence relevant to punishment. Then in the final hearing held on August 17, 1979, the court sentenced defendant to 30 years' confinement for rape of the daughter, to life imprisonment for murder of the mother, and to death for capital murder of the daughter.

The sentence of death is before us for review as required by Code § 17-110.1(A). See Rule 5:20. We have consolidated this review with defendant's appeal of his capital murder conviction, Code § 17-110.1(F), and accorded the matter priority on our docket. Code § 17-110.2. We do not have before us for review the noncapital convictions.

The evidence was without substantial conflict. During the guilt phase of the trial, the Commonwealth called a number of the investigating police officers, the medical examiner who performed autopsies on the victims, the mother's employer, a forensic scientist, and a psychiatrist who examined the defendant prior to trial. Defendant's evidence consisted of the testimony of two Jacksonville, Florida, deputy sheriffs.

Chronologically, the evidence disclosed the following facts. Shortly after noon on Monday, February 5, several city police officers went to a second floor apartment in Norfolk's East Ocean View Section on a homicide investigation. They first found a body, later identified as Toni Kline, on the bathroom floor. The corpse was fully clothed

wearing a heavy zippered jacket. An autopsy revealed that she had died from loss of blood caused by three knife wounds. As the officers began to examine the other rooms in the apartment, access to one bedroom was barred by the presence inside of two vicious dogs, one being a German Shepherd. A neighbor was called to remove the dogs and upon entering the bedroom the police found another body, later identified as Michelle Kline. The autopsy disclosed that she died from strangulation and that she had been abused sexually. The medical examiner testified the daughter died "some hours" before the mother.

The manager of a local Seven-Eleven Store, the employer of the mother, was called to the scene, identified the victims, and indicated the mother had reported for work at 3:00 p.m. on the previous day, a Sunday.

Among the items of evidence collected by the police at the scene were latent fingerprints, articles stained with blood, and hair samples. Based upon "information" received in the apartment neighborhood, the police "developed" the name of a suspect and a location where he might be headed. On Monday night the Norfolk police notified the police in Jacksonville, Florida, to be on the lookout for defendant.

On the next day, Tuesday, February 6, Charles E. Wells, a uniformed Jacksonville deputy sheriff, was eating breakfast alone at 3:00 a.m. in that city's Greyhound bus terminal. Defendant approached Wells, asked to talk with him, sat down and told Wells he had "killed two people in Norfolk, Virginia, and wanted to turn himself in." After determining defendant's identity, Wells learned by radio that a "capias" had been issued in Norfolk for defendant's arrest. Wells then "advised the defendant of his rights" by reading from a pocket card; defendant said he understood them. According to the officer, defendant's manner, behavior and demeanor appeared "normal" and "rational." Defendant then told Wells a "lady in Norfolk . . . owed him a thousand dollars and she refused to pay and an argument ensued and he killed her." He also said that "after he had killed the lady . . . her daughter became excited and started to scream, so he strangled her and raped her."

Another Jacksonville deputy sheriff, William J. Mooyham, responded to Wells' call and took defendant from the bus station to the Sheriff's Department Headquarters "downtown." During questioning by Mooyham which lasted about ninety minutes, defendant related the same account of the killings but made no statement about sexual abuse or assault. Defendant's "general demeanor" appeared "good"

to Mooyham and defendant made "sense" when he talked to the officer.

Defendant was indicted on the four charges in Norfolk on February 7. Two Norfolk officers, Detective Ralph J. Mears and Corporal R. D. Whitt, travelled to Jacksonville and on Thursday, February 8, questioned defendant in the Jacksonville City Jail. Defendant was again advised "in detail" of his constitutional rights as required by *Miranda v. Arizona*, 384 U.S. 436 (1966). To these officers, defendant appeared "intelligent and alert" and to "understand the rights as explained to him." Defendant signed in the officers' presence a printed form, received in evidence, waiving his *Miranda* rights. Thereafter, defendant confessed to the crimes in a question-and-answer statement which he signed after it was reduced to writing. The actual questioning was completed in an hour and fifteen minutes.

In his written confession to the Norfolk officers, also received in evidence, defendant said he had known the victims about two months and had lived in their apartment for three or four weeks; that Toni Kline had permitted him to stay there until he "went back on a boat"; and that he left the apartment on the Thursday before the murders. Defendant stated that during the period he lived with the Klines, he had sexual intercourse with the mother "two or three times" and that the daughter had performed fellatio upon him. He denied having intercourse with Michelle before the time of the crimes.

In the confession, defendant said he went to the Klines' apartment on the day of the murders, Sunday, February 4, about 6:00 p.m. and, finding no one there, left, then returned about 8:00 p.m. He stated Michelle allowed him to come in and that he was under the influence of drugs, having taken four "grains" of the drug Dilaudid.[1]

Defendant continued that he was "pretty high" and that he and the girl "sat around and talked." He stated she "started rubbing up against" him and they went into a bedroom. Defendant said that when she refused "to have sex" with him, he "grabbed her" as she started to leave the room, "jerked her" back, and "threw" her on the bed. She thought defendant was "joking," he said, but as he began to undress her, she began "fighting and resisting [him] and screamed." Defendant stated, "I told her to shut up and I raped her." After he had "finished," she began "hollering and screaming and I told her to shut up," defendant stated. He said, "She wouldn't, so I strangled

---

[1] The original signed statement introduced in evidence uses "grains," but the transcript of testimony employs "grams."

her with my hands." Defendant said that during this period of time, the two dogs were "running around the house."

Defendant stated that when he realized Michelle was dead, he "threw" a blanket over her, "went downstairs and packed [his] stuff" that was in a friend's car outside.

Defendant stated he then "started walking down the street" and noticed lights burning in the apartment. He said he returned to cut off the lights, locked the apartment door as he went in, proceeded to the kitchen to turn off the lights, and heard "Toni banging on the [front] door." Defendant said he took a knife from the kitchen, "waited by the wall in the living room," and, as the mother unlocked the door, he "jumped out" to "run down the stairs." But she "started screaming," defendant said, and he stabbed her two or three times as she fought with him; defendant was not injured.

Defendant said both dogs were in the bedroom when he left the apartment the second time. He proceeded out the front door, locked it with Michelle's keys, threw the knife "out in the yard," and tossed "the keys in the dumpster across the street." He then walked "quite a ways," called a taxicab, went to a Norfolk bus station, and boarded a bus for Jacksonville at 6:00 a.m. on Monday morning.

When asked during the course of the confession why he stabbed the mother, defendant replied, "I stayed there because I knew Barbara would know I was the one that killed Michelle and I wanted to keep her from talking." Mears testified defendant told the Norfolk officers that "money was not a factor" in the killings and told them that the original statement he gave to the Jacksonville police was "not the way it was."

Defendant was returned to Norfolk. Specimens of his body hairs and a pair of defendant's brown boots were sent by the police to a forensic scientist for analysis.

The record shows that on February 16 the circuit court appointed counsel for defendant and, on motion of the Commonwealth, ordered Dr. J. S. Santos of Norfolk to examine defendant pursuant to Code § 19.2-169. Santos was to report upon defendant's mental condition and whether he was mentally competent to stand trial. On the same day, Santos conducted an examination and reported to the court that defendant was "hostile, belligerent, antagonistic, negativistic, and ha[d] no desire to communicate with anyone." Santos did not render an opinion on defendant's mental condition but because of defendant's "mental difficulties" recommended emergency hospitalization at Central State Hospital in Petersburg. On the next day, the trial court,

on motion of the Commonwealth, ordered defendant delivered to Central State for examination and observation pursuant to Code § 19.2-169. The court also ordered the Superintendent of Central State to report on defendant's mental condition on the day of the crimes.

Defendant was admitted to Central State on February 17, and Dr. Miller M. Ryans, a staff psychiatrist, sent a written report on defendant's condition to the trial judge five days later.

At trial, Dr. Ryans testified defendant was at Central State for a period of nine days during which no evidence of mental illness or feeblemindedness was found. Defendant was suffering from a "transitional disturbance of adult life with anxiety manifestations," according to Ryans. He stated that defendant was mentally competent to stand trial and at the time of the offenses was not mentally ill.

Ryans testified defendant's physical examination showed a damaged liver resulting from a "prolonged assault on the liver from drinking heavily over a long period of time." He stated defendant told him that on the day of the crimes he was "high" on cocaine and Dilaudid possibly mixed with alcohol. On cross-examination, the physician gave the following opinions as to defendant's condition at the time of the crimes:

Q. If you were advised that the defendant had taken as much as four grams of this particular drug given his size and weight and so forth, what effect do you believe as a medical doctor it by itself, that four grams of Dilaudid could have upon him?

A. The Dilaudid comes in one milligram, two milligrams, three milligrams and four milligram doses and you have the three milligram suppositories you can place in the rectum, so four milligrams would constitute the therapeutic dose if the person were in great pain. It would give them release. Now, if you were taking it for other purposes, it would most likely induce a euphoric type of response, a feeling of well-being and, as they say, a floating feeling.

Q. Would you be able to tell us what effect the two drugs cocaine and Dilaudid in that quantity I have just mentioned could have on the defendant's state of mind at any given time?

A. Again, depending on the individual response, you could have anywhere from a mild response to a severe response to the point of respiratory collapse and death. In between you have a high excitement, toxic psychosis and confusion, excitement and auditory, visual and at that time hallucinations.

Q. Giving your interpretation of the test which showed liver damage and given the defendant['s] . . . statement to you during an interview that he had taken cocaine and Dilaudid on the night that these terrible events happened, what could be or what would be your projection of what would happen to a person, all things coming together, a history of alcoholism, ingestion of cocaine, ingestion of Dilaudid in as much as he says four grams, but let's take it as four units, the milligram dosage that you mentioned?

A. In a very impulsive type person which our psychologicals reveal it could loosen his controls and he could engage in behavior which ordinarily he would not take part in.

Ryans also testified that defendant told him the mother was the first victim, the daughter was the second, and "that money was involved." When asked to comment on defendant's differing accounts of the crimes with the time sequence reversed, Ryans attributed this to the combination of the drugs. Ryans stated that a person in such a condition has "peripheral neuropathy, loss of recent memory and they confabulate." Ryans opined:

That is, under the influence of these various medications and beverages they are aware of what happened, but they can't get it straight in their mind so they confabulate by saying what makes sense, what should have happened here and then they say, well, most likely this is what happened and they make up things and they confabulate consistent with what we call a Korsakoff's syndrome. They are not doing it on purpose, but they simply can't remember, so they will say this is what most likely happened so this is what I will say.

Ryans rejected the suggestion made on cross-examination that such a situation amounted to a degree of insanity such that defendant would not or could not know right from wrong at the time of the offense.

Also testifying for the Commonwealth were Officer L. C. Melcher, a latent fingerprint examiner with the Norfolk Police Department, and June Esther Browne of the State Bureau of Forensic Science, who qualified as an expert in serology and microanalysis. Melcher testified that of the latent fingerprints found at the scene, 17 were identified as matching the known prints of defendant. He said it was

"possible" for latent prints to remain on some surfaces for weeks or months if the surface had not been cleaned.[2]

Browne testified that human blood type O found on a towel in the Kline apartment was also found on the front and side of one of defendant's boots. She also testified that one of the loose hairs found on Michelle's left hand, stomach and pubic area was consistent in "race, color and microscopic characteristics" with one of defendant's pubic hairs. She further stated that a substance removed from Michelle's vagina and cervix was "intact spermatozoa."

Following conclusion of the evidence and argument of counsel on the issue of criminal responsibility, the trial court announced the findings of guilt on the three indictments and of innocence on the fourth, continuing the case for sentencing.

In connection with the conviction under review, the elements of the charge are set forth in the applicable statute:

> The following offenses shall constitute capital murder, punishable [by death]:
>
> *     *     *
>
> (e) The willful, deliberate and premeditated killing of a person during the commission of, or subsequent to, rape; . . . .

Code § 18.2-31.

Defendant argues on appeal that the Commonwealth has failed to show beyond a reasonable doubt that the killing of Michelle was wilful, deliberate and premeditated so as to elevate the offense from murder in the second degree to capital murder. Defendant points to the evidence that defendant had taken "the strongest possible single dose of a very potent drug prior to killing Michelle Kline," that defendant was "high on drugs" at the time of the offense, and that his condition caused a lapse of memory of the events in question. He contends that the discrepancies in his post-arrest statements are further evidence of his intoxication at the time Michelle was killed. Consequently, he argues, his ability to premeditate a murder was impaired. He also says the evidence shows he became angry when Michelle refused to have sexual relations and thus his conduct is more consistent with an unpremeditated killing done in sudden anger. He argues the trial court erred in "disregarding the evidence of intoxi-

---

[2] At 1:20 p.m. on February 5, Melcher video-taped the crime scene as it appeared upon arrival of the police. The tape was received in evidence and we have viewed it.

cation" and in finding there was sufficient time for defendant to deliberate after he became angry and before the killing. Thus, defendant concludes, the court below reached a factual conclusion of capital murder unsupported by the evidence. We do not agree.

■ A person who voluntarily has become so intoxicated as to be unable to deliberate and premeditate cannot commit any class of murder that is defined as a wilful, deliberate and premeditated killing. *Hatcher* v. *Commonwealth*, 218 Va. 811, 814, 241 S.E.2d 756, 758 (1978). But mere intoxication from drugs or alcohol will not suffice to negate premeditation. *See Waye* v. *Commonwealth*, 219 Va. 683, 698, 251 S.E.2d 202, 211, *cert. denied*, 442 U.S. 924 (1979). Here, while the evidence shows defendant was "high" from voluntary ingestion of drugs and possibly alcohol at the time of the offense, there was abundant credible evidence from which the trial court, acting as the fact finder, could properly determine that defendant's level of intoxication was not so great as to render him incapable of committing a deliberate and premeditated killing.

Defendant's conduct immediately before and after the capital homicide belie his claim of mental incapacity induced by drugs and alcohol. For example, when defendant found no one in the apartment at 6:00 p.m., he left and then returned. Upon his return two hours later, he entered and conversed for a period of time with Michelle. When he detected what he thought were sexual advances by the girl, he went with her into the bedroom. The encounter was apparently nothing more than an uneventful liaison until a violent struggle developed when the girl balked at his advances.

Subsequent to the rape and murder of Michelle, defendant covered the body with a blanket, left the apartment, and packed his belongings stored in a friend's automobile. As he began to leave the area, he returned to the apartment to extinguish the lights. He remained there for an undetermined period of time, probably an hour or more, having decided to lie in wait for the mother to "keep her from talking." Such a waiting period may properly be inferred from the medical evidence that the mother was killed "some hours" after her daughter.

The foregoing facts demonstrate the actions of a person, though "high," whose mind was nevertheless operating in a logical, deliberate, evil and sinister fashion. That same evidence negates the conclusion that at the time of the homicide the accused was deprived of his mental capacity to premeditate.

■ In addition, we believe the evidence is entirely sufficient to

show that defendant's intent to kill existed for a sufficient period of time to permit premeditation. The facts here are strikingly similar to those in *Akers* v. *Commonwealth,* 216 Va. 40, 216 S.E.2d 28 (1975), in which we reviewed a first degree murder conviction. There, defendant had stabbed the deceased when she began to scream and yell "rape" and "help" as the accused was sexually assaulting her. In holding premeditation existed, we repeated the settled rule that to constitute a wilful, deliberate and premeditated homicide, the intention to kill need not exist for any specified length of time prior to the actual killing. 216 Va. at 48, 216 S.E.2d at 33. A design to kill may be formed only a moment before the fatal act is committed provided the accused had time to think and did intend to kill. *Bradshaw* v. *Commonwealth,* 174 Va. 391, 399, 4 S.E.2d 752, 755 (1939).

Here, the evidence shows that Michelle, subsequent to the rape, began "hollering and screaming." Then the accused told her to "shut up." When she continued her outcries, defendant strangled her. Reasonably to be inferred from this sequence of events is that ample time elapsed for the accused to deliberate and meditate, at least for a matter of seconds, upon his design and purpose to kill the victim. Such an interval of time is sufficient to justify the trial court in finding premeditation as a matter of fact.

■ Turning to the penalty aspect of this case, we consider defendant's argument that the trial court erred in imposing the death sentence.

Code § 19.2-264.4 provides that upon a finding that the defendant is guilty of an offense which may be punishable by death, a proceeding shall be held which shall be limited to a determination whether the defendant shall be sentenced to death or life imprisonment. That statute further provides that the "penalty of death shall not be imposed unless the Commonwealth shall prove beyond a reasonable doubt that there is a probability based upon evidence of the prior history of the defendant or of the circumstances surrounding the commission of the offense of which he is accused that he would commit criminal acts of violence that would constitute a continuing serious threat to society, or that his conduct in committing the offense was outrageously or wantonly vile, horrible or inhuman, in that it involved torture, depravity of mind or aggravated battery to the victim." The section also provides that admissible evidence may include the circumstances surrounding the offense, the history and background of the defendant, and any other facts in mitigation of the

offense. According to the statute, facts in mitigation may include, but shall not be limited to, the following: "(i) The defendant has no significant history of prior criminal activity, or (ii) the capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance or (iii) the victim was a participant in the defendant's conduct or consented to the act, or (iv) at the time of the commission of the capital felony, the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was significantly impaired; or (v) the age of the defendant at the time of the commission of the capital offense."

On June 18, 1979, upon motion of defendant's attorney, the trial court ordered defendant transported to Charlottesville for examination and testing at the Forensic Psychiatry Clinic of the University of Virginia Hospital. The Clinic was directed to address, for purposes of the sentencing process only, whether the offense of which defendant had been convicted was committed under the influence of extreme mental or emotional disturbance and whether defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was significantly impaired. Defendant was subsequently examined, tested, and evaluated at the Clinic during the last week of June, and Dr. C. Robert Showalter, a psychiatrist and Clinical Director, submitted a detailed report prior to the August 1979 sentencing hearings.

During those hearings the Commonwealth presented the testimony of Dr. Ryans and John P. Jacknik, a probation officer who compiled a pre-sentence report at the trial court's direction; defendant called Dr. Showalter and Carol Parise, defendant's mother.

Testimony showed that defendant, a resident of Jacksonville, started using drugs at age 11 and that for a number of years he has had a significant drug-alcohol problem. Defendant has a record of criminal offenses, of suicide attempts, and of an escape from confinement. While committing criminal acts as a juvenile, he was treated as an adult and punished accordingly.

To probation officers, defendant was "almost boastful about his criminality," stating, among other things, that he had committed a robbery in 1977 for which he was not arrested. Defendant also claimed to have served as a bodyguard for "one of the biggest cocaine dealers in Florida."

Defendant's life-style for the seven or eight years before the capital crime was summarized by the probation officer:

Heavily actively involved in drugs. There are some violent outbursts. There's a great deal of self-destructive behavior, things that would lead him into trouble. He works occasionally by his own admissions earning enough to pay for drugs.

Defendant's existence was described as having been "tumultuous" and his "background" as "unstable." At the age of 16, defendant met his father in the same prison where both were incarcerated.

Dr. Ryans testified that based upon his evaluation of defendant, which included a review of the reports of the Forensic Psychiatry Clinic, "it is probable that this gentleman if he were to be released would continue to present a threat to society from the viewpoint of his basic personality, and his drug and drinking problem." Ryans described defendant's "mechanism of social control" thus:

As stated and admitted by the defendant, he's had this long history of drug use and alcohol abuse. Then, this in and of itself adds to his inability to control himself, and our testing showed that he was a sort of impulsive individual as well as alienated from society and self-centered and negativistic. This along with the alcohol abuse and drug abuse would make his ability to control himself very fragile to say the least.

Ryans further said that "at the moment he's a walking, ticking time bomb, either for killing himself or if he were exposed to society, I expect there's a strong possibility that he could continue to act in a socially unacceptable manner." He also said that defendant, in his present condition and if incarcerated, would constitute a homicidal threat to himself and to the prison population. Defendant stated to Ryans that he wanted to kill himself and if one of Ryans' aides "tried to stop him, he would make sure he would take the aide with him."

Dr. Showalter testified defendant suffered from a "schizoid personality disturbance" in which the individual is quite "withdrawn" in dealing with other persons. Showalter felt that defendant had developed an intense hatred of his mother and of his younger sister because the mother abused him as a child and because the two women engaged in lewd and debasing conduct. He opined that this anger and hostility was repressed over the years and "turned inward." During the weeks before the capital crime, defendant "found himself living in a situation which in many respects symbolically reconstituted the situation that existed between Mr. Giarrantano, his mother

and his sister, namely he had a room in a living situation in which the mother, namely Mrs. Kline, and the daughter . . . in many respects brought to life a similar set of conflicts that he had experienced in his earlier life when he was living in his original nuclear family setting."

Showalter stated there was a "symbolic connection or symbolic explanation" for the capital crime and the murder of Toni Kline. He testified that defendant's "previously suppressed rage and anger" had been "reactivated by the sequence of events [with] Michelle" and that the murders were "symbolic acts" by which defendant's hatred was discharged against persons he identified in his mind with his mother and sister.

Showalter concluded that defendant was under extreme mental and emotional disturbance at the time of the crimes from the accumulated stress of his prior environment and from the acute stress of drug abuse. He was also of opinion that defendant suffered from "serious impairments, both chronic and acute, of his capacity to control his behavior." He agreed that if defendant was to be "at large in the community" in the future, defendant had the "potential" for violence if he again became confronted with a situation symbolically identical with his relationship to his mother and sister.

During her testimony, defendant's mother confirmed Showalter's account of defendant's childhood.

In a thorough, detailed, and documented memorandum read at the sentencing hearing, the trial judge set forth his findings. In determining the Commonwealth had carried its burden of proof and had met the statutory requirements, *supra,* for a penalty of death, the court below said:

> Dr. Ryans and Dr. Showalter differed in one conclusion. Dr. Ryans was not strongly persuaded that the murders were symbolic killings but more that they were acts directed at the actual victims for the defendant's own purposes, though at a time when his self control was fragile because of self imposed intoxication. Dr. Showalter concluded that the acts were in fact symbolic attacks contributed to by the surfacing of repressed anger and hatred of the past which he termed the 'chronic' component of the stress. However, he agreed that the 'acute' dimension of distress was related to defendant's drug abuse.
>
> There is no evidence that the acts were affirmatively caused by the emotional stress from either source, but only that such stresses caused him to be 'sufficiently disinhibited so as to be

able to carry out an act of this magnitude.' . . . . They were acts of rage and hatred which were not prevented by defendant's self control in its diminished capacity.

Nor is there evidence that the 'chronic' component of the stress, which was not self imposed, would by itself have been sufficient to allow these acts. Dr. Ryans feels that the self imposed drug and alcohol abuse was essentially the sole contributing stress factor and Dr. Showalter agrees that this was the 'acute' stress factor.

The court concludes that the evidence of emotional stress and reduced control, while admissible by statute and carefully considered by the court, is not of such nature as to mitigate the penalty in this case. By becoming an habituate of drugs and alcohol one does not cloak himself with immunity from penalty for his criminal acts.

Upon our review of the death sentence, we must consider and determine whether the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor. We must also consider and determine whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. Code § 17-110.1(C). Defendant argues the trial court imposed the death penalty in an arbitrary fashion and that the sentence is excessive and disproportionate to the penalty imposed in similar cases. He contends the court below confused the statutory standards of § 19.2-264.4, *supra,* relating to mental disturbance and impaired capacity, with the legal test for insanity at the time of the offense. He points out that facts in mitigation of punishment need not rise to the level required to prove defendant insane and argues that the trial court did not assign "proper weight to the evidence of defendant's mental state at the time of the commission of the offenses." Defendant concludes that the reasonable and just sentence, if the conviction is affirmed, is more properly life in the penitentiary rather than death. We do not agree.

The evidence was abundant and overwhelming that there is a distinct probability defendant will commit criminal acts of violence that would constitute a continuing serious threat to society. The defendant's prior criminal record, his threats of future harm to others, his slaying of Toni Kline soon after the capital murder of Michelle, and the medical evidence all support the trial court's conclusion as to potential for future violent conduct. And the trial court did not confuse the impact the evidence in mitigation should have

with the legal test for insanity upon commission of the crime. In the sentencing memorandum, the trial judge was careful to point out that the evidence of "emotional stress and reduced control," not of legal insanity, was insufficient to mitigate the penalty. Thus, we hold that no arbitrary factors influenced the sentence in this case.

■ Upon the issues of excessiveness and disproportionality, we have three prior rape cases decided under the revised death penalty statutes with which to compare this case in order to decide whether generally in this jurisdiction triers of fact "impose the death sentence for conduct similar to that of the defendant." *Stamper* v. *Commonwealth,* 220 Va. 260, 284, 257 S.E.2d 808, 824 (1979). In *Smith* v. *Commonwealth,* 219 Va. 455, 248 S.E.2d 135 (1978), *cert. denied,* 441 U.S. 967 (1979); *Waye* v. *Commonwealth, supra;* and *Mason* v. *Commonwealth,* 219 Va. 1091, 254 S.E.2d 116, *cert. denied,* 444 U.S. 919 (1979), we affirmed the death sentence for murder committed during or following rape. The victims in each of those cases were adults who were otherwise subjected to aggravated battery. Here, while there was no severe beating, this child of 15 years was sexually abused in addition to being raped. In the opinion of the medical examiner, the findings of fresh bleeding from the vagina and lacerations of the cervix were injuries consistent with sexual abuse as well as sexual intercourse. In addition, a pressure abrasion on the groin resembling a bite mark was noted. Also, we cannot disregard the utter horror which must have been experienced by this child during the moments before her death while she was being strangled by the bare hands of the defendant in this atmosphere of violence. In our view, this sentence is not excessive or disproportionate to the penalty imposed in similar cases, considering both this crime and this defendant.

For the foregoing reasons, we hold the trial court committed no error, and we have independently determined from a review of the whole record that the sentence of death was properly assessed. Accordingly, the judgment of the trial court will be

*Affirmed.*