COURT OF APPEALS OF VIRGINIA

Present:   Judges AtLee, Lorish and Frucci

DIVINE RAHIM JACKSON

MEMORANDUM OPINION[*]

v.      Record No. 0809-24-1

PER CURIAM
OCTOBER 7, 2025

COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF THE CITY OF NEWPORT NEWS
Gary A. Mills, Judge

(Charles E. Haden, on brief), for appellant.

(Jason S. Miyares, Attorney General; Aaron J. Campbell, Assistant
Attorney General, on brief), for appellee.


Following a jury trial, the Circuit Court of the City of Newport News convicted Divine

Rahim Jackson of first-degree murder and use of a firearm in the commission of murder.

Jackson contends that the circuit court erred in finding the evidence sufficient to support his

convictions, refusing his proposed jury instruction on justifiable self-defense, and denying his

motion *in limine* seeking to exclude from the evidence video surveillance and certain

photographs.  After examining the briefs and record in this case, the panel unanimously holds

that oral argument is unnecessary because "the appeal is wholly without merit."  Code

§ 17.1-403(ii)(a); Rule 5A:27(a).

---

[*] This opinion is not designated for publication.  *See* Code § 17.1-413(A).

BACKGROUND

"Consistent with the standard of review when a criminal appellant challenges the sufficiency of the evidence, we recite the evidence below 'in the "light most favorable" to the Commonwealth, the prevailing party in the trial court.'" *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022) (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)). This standard "requires us to 'discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom.'" *Cady*, 300 Va. at 329 (quoting *Commonwealth v. Perkins*, 295 Va. 323, 324 (2018)).

At around 5:30 p.m. on July 8, 2022, Newport News Police Officer Christopher Hensley was dispatched to a 7-Eleven store on Warwick Boulevard for "a shooting that had just occurred." Upon his arrival, Officer Hensley located a white male, later identified as M.F.,[1] lying on his back in front of the door with a gunshot wound to his head. Officer Hensley set up a crime scene and later rode in the ambulance to the hospital where he learned that M.F. was alive but brain dead. Meanwhile, Newport News Detective Joseph Torres responded to the 7-Eleven and downloaded video surveillance from the store's security cameras. He also visited a Plaza Azteca down the street and recovered video surveillance from that restaurant for the time frame between 3:50 and 5:30 p.m. that day.

Bernardo Raigozza worked at Plaza Azteca. Raigozza confirmed that Jackson and his girlfriend Lateisha Meade arrived at the Plaza Azteca in a black BMW. Raigozza waited on Jackson and Meade, and the couple paid with a credit card and left the restaurant a little after 5:00 p.m. Raigozza later gave detectives a copy of the merchant's receipt showing the date and time Jackson and Meade were in the restaurant.

---

[1] We use initials, rather than names, to protect the privacy of the victim.

Stella Barbrey worked at the 7-Eleven and was familiar with M.F. because he was a frequent customer. Barbrey testified that M.F. entered the 7-Eleven at around 5:00 p.m. on July 8, said "hello," and approached the refrigerators to get a drink. M.F. then went outside and stood for a while in front of the store. Barbrey explained that because M.F. was known to "talk a lot sometimes," 7-Eleven employees "would always divert him" by telling him to leave the customers alone, that "they have to go somewhere," and that M.F. was "talking their ear off." Thus, when Barbrey saw that M.F. was "talking to a female outside," she opened the door and said jokingly, "leave that girl alone. She's got somewhere to be." M.F. and Meade's conversation ended, and Meade started walking away from M.F., back towards Jackson's vehicle. Barbrey then observed a "gentleman," later identified as Jackson, angrily approach M.F., loudly ask if M.F. was "f—ing talking to [his] girl," and then hit M.F. twice. M.F. "stumbled with his words" to say, "I'm sorry." Barbrey noticed that M.F. was not aggressive and instead looked shocked and scared during the exchange. During this exchange, Meade was behind Jackson, attempting to pull him away to leave the situation. Barbrey yelled for Jackson to "just chill" and asked someone to call the police. But Jackson pulled a gun on M.F. and "that was that." At trial, Barbrey identified Jackson as the man who shot and killed M.F.[2]

Amanda Griffin was inside the 7-Eleven at the register when the shooting occurred. She heard Barbrey yelling, "stop, stop. This isn't necessary. Don't do this," and looked up. Griffin saw through the window that M.F. "had a gun pointed in between his eyes" and that his hands were in the air with his palms facing up. Jackson was loudly asking why M.F. was talking to his girl, and although M.F. did not speak loudly, Griffin believed from his body language that he was apologizing.

---

[2] The murder was captured on the store's video surveillance cameras, which depicted M.F. speaking with Meade before Jackson approached him, struck him twice in the face, shot him, and then fled.

Christopher Robbins was with M.F. when they entered the 7-Eleven. Robbins purchased a drink and then went outside to wait for a ride. When his ride arrived, Robbins walked past a black vehicle and noticed that a "young male" was on the phone arguing with someone. He also noticed a gun on the vehicle's dashboard. Less than five minutes later, Jackson exited that vehicle and walked straight toward M.F. as he stood speaking with Meade.

Newport News Forensic Specialist Catherine Cole processed the crime scene and recovered one .40 caliber cartridge casing in front of the store. Specialist Cole later sent the cartridge case to the Department of Forensic Science for analysis.

Assistant Chief Medical Examiner Wendy Gunther testified that a former colleague no longer working in the office performed M.F.'s autopsy on July 9, 2022. Dr. Gunther testified that the autopsy showed M.F. died of a single gunshot wound to the head that was fired from an "indeterminate range," meaning that the perpetrator "didn't shoot from close enough to leave gunpowder." Dr. Gunther explained that the bullet went through M.F.'s lip, knocked out three of his teeth, and proceeded through his tongue into the floor of his mouth and then the top of his neck, breaking off one of the side pieces of his spine and taking out the vertebral artery. Dr. Gunther opined that "anyone would have died from this injury, so [M.F.] died from this injury." The medical examiner retrieved the bullet from the back of M.F.'s neck, six-and-a-half inches down below the top of his head and "just a half-inch right of the back of his neck." The medical examiner gave the bullet to the Newport News Police Department for later analysis.

Newport News Police Detective Cody Ruhlen was assigned to the investigation. Detective Ruhlen responded to the 7-Eleven, spoke with the witnesses, and reviewed the camera footage that Detective Torres had recovered. In the footage from Plaza Azteca, Jackson was captured fondling Meade's breasts and could be seen openly handling his firearm. Detective Ruhlen obtained Jackson's name from the restaurant receipt and later identified Meade. A

search warrant was executed at Meade's apartment at around midnight on July 9, 2022, and Jackson was arrested. Detective Ruhlen also obtained a search warrant for Jackson's phone records to obtain location information on his phone and consulted Jackson's social media accounts. Detective Ruhlen recovered photographs of Jackson wearing a pendant of a firearm and the same belt he was wearing in the video surveillance at both Plaza Azteca and the crime scene.[3] At trial, the court admitted two photographs from Jackson's social media accounts and the camera footage from Plaza Azteca.

Newport News Forensic Technician Roberta Woller responded to Meade's apartment during the execution of the search warrant to collect evidence. In a dresser drawer in one of the bedrooms, Woller found the belt that Jackson wore during the shooting, and she recovered Jackson's ID and debit card. She also found Jackson's iPhone. On the right-hand side of the couch "inside a fold up massage table," Woller located a silver and black Smith & Wesson SD40 VE .40 caliber handgun. She then found a black ProMag extended magazine in a bin under the coffee table. Woller later submitted the firearm to the Department of Forensic Science for analysis.

Forensic Scientist Helen Lake testified as an expert in firearms and toolmark identification. Lake received the cartridge casing that was found at the 7-Eleven, the bullet recovered from M.F. during his autopsy, and the firearm found in Meade's apartment for comparison. Lake's examination revealed that the cartridge casing and the bullet were fired from the .40 caliber Smith & Wesson recovered from Meade's apartment.

---

[3] Before trial, Jackson filed a motion *in limine* seeking to exclude the social media photographs and Plaza Azteca footage as more prejudicial than probative. The Commonwealth responded that the photos were relevant to establish his identity as the shooter and the video footage was relevant to establish his relationship with Meade, which went toward motive. The circuit court denied the motion *in limine* after the Commonwealth agreed to redact any references in the photos to gang activity.

Newport News Police Detective Andrew Parker testified as an expert in call detail records, geolocation records, and cell phone download analysis. Detective Parker reviewed phone records associated with Jackson's cell phone and verified that his phone was in the area of Plaza Azteca and the 7-Eleven at the time of the shooting and that the phone then traveled into the area of Meade's apartment where it remained until his arrest.

Jackson testified that when he and Meade pulled into the 7-Eleven, he sat in the car and spoke on the phone with his mother while Meade entered the store. Jackson denied that he was arguing with his mother, and he denied that his firearm was ever on the dashboard. He said that as he spoke on the phone, he saw that Meade was "being harassed" by someone he didn't know. Jackson felt "concerned" because it appeared to him that Meade was "irritated, bothered, or annoyed." He admitted that he "approached the situation not knowing what was going on" and said he "just wanted to make sure [Meade] was going to be okay." Jackson explained that he carried a firearm "for protection" and that his gun was in his waistband as he approached M.F. As he approached the situation, Jackson asked, "What's going on? Is everything all right?" and he heard M.F. say, "Who the F is this or what the F is that?" and "Who the F is this black n****?" Jackson admitted that he "react[ed]" by "swinging" at M.F., all the while inquiring, "Why are you harassing her?" Jackson testified that M.F. responded, "F you, n****. I'll kill you."

Jackson explained that he pulled his firearm and pointed it at M.F. simply to "take it back one notch." He told M.F., "Can you back up? Can you leave? I'm not looking for a problem. I have a firearm." Jackson stated that M.F. "then looked at [him]" and said, "I'll take that firearm out your hands and kill you." Jackson insisted that "at that moment right there" he was "completely in fear," because he did not know M.F. or what he was "capable of." Jackson said that M.F. looked right in his face and constantly repeated, "Give me the gun. I'll kill you. Give

me the gun.  I'll kill you."  Jackson testified that he feared "death, danger, and great bodily harm" because M.F. was "yanking" on the gun and trying to take it out of his hand.  Jackson said that as they struggled for the gun, it "[went] off only one time."  He had "no intention at all of hurting anyone."

Jackson moved to strike the evidence as insufficient to prove that he acted with premeditation and deliberation.  He did not contest that his actions were malicious.  The circuit court denied Jackson's motion to strike but instructed the jury on the elements of both first and second-degree murder.  Jackson also proposed the following "at-fault self-defense" instruction:

> If you believe that the defendant was to some degree at fault in provoking or bringing on the [fight; difficulty], but you further believe that:
>
> (1) he retreated as far as he safely could under the circumstances in a good faith attempt to abandon the fight; and
>
> (2) he made known his desire for peace by word or act; and
>
> (3) he reasonably feared, under the circumstances as they appeared to him, that he was in imminent danger of being killed or that he was in imminent danger of great bodily harm; and
>
> (4) he used no more force, under the circumstances as they appeared to him, than was reasonably necessary to protect himself from the perceived harm,
>
> then the killing was in self-defense, and you shall find the defendant not guilty

The circuit court denied the instruction upon its finding that there was "no evidence" Jackson "retreated," as required by the instruction.

Following closing arguments and deliberations, the jury convicted Jackson of first-degree murder and use of a firearm in the commission of murder.  Jackson appeals.

ANALYSIS

I. Sufficiency of the Evidence

"When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (alteration in original) (quoting *Smith v. Commonwealth*, 296 Va. 450, 460 (2018)). "In such cases, '[t]he Court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Id.* (alteration in original) (quoting *Secret v. Commonwealth*, 296 Va. 204, 228 (2018)). "Rather, the relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Vasquez v. Commonwealth*, 291 Va. 232, 248 (2016) (quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *McGowan*, 72 Va. App. at 521 (quoting *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018)).

In Virginia, malicious homicide is second-degree murder by default; it rises to first-degree murder only if the Commonwealth proves the homicide was willful, deliberate, and premeditated. Code § 18.2-32; *see Willis v. Commonwealth*, 37 Va. App. 224, 230 (2001). "Premeditated murder . . . contemplates: (1) a killing; (2) a reasoning process antecedent to the act of killing, resulting in the formation of a specific intent to kill; and (3) the performance of that act with malicious intent." *Fields v. Commonwealth*, 73 Va. App. 652, 674 (2021) (alteration in original) (quoting *Rhodes v. Commonwealth*, 238 Va. 480, 486 (1989)). Malicious intent "includes not only anger, hatred and revenge, but every unlawful and [unjustified]

motive." *Watson-Scott v. Commonwealth*, 298 Va. 251, 256 (2019) (alteration in original) (quoting *Martin v. Commonwealth*, 184 Va. 1009, 1015 (1946)).

A. Malice

Jackson first asserts that the first-degree murder charge should have been reduced to voluntary manslaughter because the evidence failed to prove he acted with "malice aforethought." Jackson claims that although this "was an intentional killing," the intent "was generated by passion [or] provocation rather than by a preexisting malicious or evil disposition." But Jackson did not make that argument or raise that objection in the circuit court. Indeed, during his motion to strike, Jackson specifically stated, "[my] argument is not that [the killing] wasn't malicious. The argument is that there wasn't any premeditation."

"No ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling, except for good cause shown or to enable this Court to attain the ends of justice." Rule 5A:18. "The purpose of this contemporaneous objection requirement is to allow the trial court a fair opportunity to resolve the issue at trial, thereby preventing unnecessary appeals and retrials." *Creamer v. Commonwealth*, 64 Va. App. 185, 195 (2015). "Specificity and timeliness undergird the contemporaneous-objection rule, animate its highly practical purpose, and allow the rule to resonate with simplicity." *Bethea v. Commonwealth*, 297 Va. 730, 743 (2019). "Not just any objection will do. It must be both *specific* and *timely*—so that the trial judge would know the particular point being made in time to do something about it." *Id.* (quoting *Dickerson v. Commonwealth*, 58 Va. App. 351, 356 (2011)). If a party fails to timely and specifically object, he waives his argument on appeal. *Arrington v. Commonwealth*, 53 Va. App. 635, 641 (2009).

Jackson did not assert in the circuit court that the evidence rose only to the level of voluntary manslaughter and was not malicious, nor did he ask for a finding instruction on the

- 9 -

elements of voluntary manslaughter. He thus failed to alert the circuit court to the specific claims he now raises on appeal; to-wit: that there was no malice in his actions, that he only acted out of fear, and that the evidence proved he committed voluntary manslaughter. It follows that Jackson is prohibited from raising that specific assertion in this Court for the first time on appeal, and we will not consider it.[4]

### B. Premeditation

Jackson also asserts that the evidence failed to prove he formed a specific intent to kill M.F. before shooting him. We disagree. The evidence, when viewed in the light most favorable to the Commonwealth, sufficiently proved that Jackson deliberately and willfully fired upon M.F., purposely to kill him.

The legal principles governing our analysis are well-settled. "Because 'premeditation and formation of an intent to kill seldom can be proved by direct evidence[,] [a] combination of circumstantial factors may be sufficient.'" *Aldridge v. Commonwealth*, 44 Va. App. 618, 655 (2004) (alterations in original) (quoting *Rhodes*, 238 Va. at 486). "The intent to kill must come into existence at some time before the killing[,] [but] it need not exist for any particular length of time." *Epperly v. Commonwealth*, 224 Va. 214, 231 (1982) (quoting *Smith v. Commonwealth*, 220 Va. 696, 700 (1980)). Indeed, "[a] design to kill may be formed only a moment before the fatal act is committed provided the accused had time to think and did intend to kill." *Id.* (quoting *Giarratano v. Commonwealth*, 220 Va. 1064, 1074 (1980)). "In deciding [whether premeditation and deliberation exist], the jury may properly consider the brutality of the attack . . . the disparity in size and strength between the defendant and the victim . . . and the defendant's lack of remorse and efforts to avoid detection." *Avent v. Commonwealth*, 279 Va.

---

[4] Jackson does not invoke the good cause or ends of justice exceptions to Rule 5A:18, and the Court will not apply the exceptions sua sponte. *Edwards v. Commonwealth*, 41 Va. App. 752, 761 (2003) (en banc).

175, 208 (2010) (first alteration in original) (quoting *Epperly*, 224 Va. at 232).  Moreover, "evidence of a mortal wound inflicted by a deadly weapon with little or no provocation creates an inference from which the trier of fact may conclude that the killer acted with premeditation." *Morris v. Commonwealth*, 17 Va. App. 575, 578 (1994).

In this case, the evidence proved that Jackson was arguing over the phone with someone when he noticed that Meade was in a discussion with M.F. in front of the 7-Eleven.  According to Barbrey's testimony, Jackson angrily approached M.F. and, lacing his words with profanity, repeatedly asked why M.F. was talking to his girlfriend.  Although M.F. stepped back and apologized, Jackson struck him twice about the head and then pulled a firearm with an extended clip out of his pants and pointed it directly at M.F.'s face.  Griffin testified that through the window she could see M.F. with his hands in the air, palms facing up, while Barbrey stood at the door yelling for Jackson to "just chill," and while, according to the camera footage, Meade tried to pull Jackson away.  The evidence showed that Jackson and Barbrey were both yelling, but M.F. was quiet and seemed shocked and scared.  Camera footage from the 7-Eleven store corroborates the eyewitness accounts and shows that when M.F. attempted to push the weapon away, Jackson pulled M.F.'s hand off the gun, stepped back, repointed the gun at M.F.'s face, and fired.  He then fled the scene.  The Supreme Court has stated more than once that "flight following the commission of a crime is evidence of guilt."  *Clagett v. Commonwealth*, 252 Va. 79, 93 (1996); *see also Jones v. Commonwealth*, 279 Va. 52, 58 (2010) ("[A]cts of flight from a crime scene, or of deceitful behavior immediately following the commission of a crime, are acts that generally cannot be explained in terms of innocent human behavior.").

In short, from the totality of the circumstances presented here, any reasonable fact finder could conclude from Jackson's actions and demeanor before, during, and after the shooting that Jackson maliciously formed a specific intent to kill M.F. before deliberately pointing the gun at

his face and pulling the trigger. We thus conclude that the evidence was sufficient to support Jackson's conviction for murder in the first-degree.

II. Self-defense Instruction

"As a general rule, the matter of granting and denying instructions . . . rest[s] in the sound discretion of the trial court." *Dandridge v. Commonwealth*, 72 Va. App. 669, 679 (2021) (alterations in original) (quoting *Lienau v. Commonwealth*, 69 Va. App. 254, 264 (2018)). "This Court's 'sole responsibility in reviewing [jury instructions] is to see that the law has been clearly stated and that the instructions cover all issues which the evidence fairly raises.'" *Bell v. Commonwealth*, 66 Va. App. 479, 486 (2016) (alteration in original) (quoting *Swisher v. Swisher*, 223 Va. 499, 503 (1982)). "While both the Commonwealth and the defense are entitled to have the jury instructed as to their theory of the case, '[j]ury instructions are properly refused if not supported by more than a scintilla of evidence.'" *Id.* (alteration in original) (quoting *Rhodes v. Commonwealth*, 41 Va. App. 195, 200 (2003)). "In determining whether evidence amounts to more than a scintilla, 'we must look at the evidence in the light most favorable to [appellant].'" *Herbin v. Commonwealth*, 28 Va. App. 173, 181 (1998) (alteration in original) (quoting *Foster v. Commonwealth*, 13 Va. App. 380, 383 (1991)). "When reviewing a trial court's refusal to give a proffered jury instruction, we view the evidence in the light most favorable to the proponent of the instruction." *Payne v. Commonwealth*, 292 Va. 855, 869 (2016) (quoting *Lawlor v. Commonwealth*, 285 Va. 187, 228-29 (2013)). "If the evidence in conflict tends to support either the prosecution or the defense's theory of the case, the jury must be instructed as to both theories." *Bell*, 66 Va. App. at 486.

"Self-defense is an affirmative defense . . . and in making such a plea, a 'defendant implicitly admits the killing was intentional and assumes the burden of introducing evidence of justification or excuse that raises a reasonable doubt in the minds of the jurors.'" *Commonwealth*

*v. Cary*, 271 Va. 87, 99 (2006) (quoting *Commonwealth v. Sands*, 262 Va. 724, 729 (2001)). "Whether an accused proves circumstances sufficient to create a reasonable doubt that he acted in self-defense is a question of fact." *Smith v. Commonwealth*, 17 Va. App. 68, 71 (1993).

"Virginia law recognizes two forms of self-defense to criminal acts of violence: self-defense without fault ("justifiable self-defense") and self-defense with fault ("excusable self-defense"). *Bell*, 66 Va. App. at 487. "Justifiable homicide in self-defense occurs where a person, without any fault on his part in provoking or bringing on the difficulty, kills another under reasonable apprehension of death or great bodily harm to himself." *Id.* (quoting *Bailey v. Commonwealth*, 200 Va. 92, 96 (1958)). On the other hand,

> *Excusable* homicide in self-defense occurs where the accused, although *in some fault in the first instance* in provoking or bringing on the difficulty, when attacked retreats as far as possible, announces his desire for peace, and kills his adversary from a reasonably apparent necessity to preserve his own life or save himself from great bodily harm.

*Cortez-Hernandez v. Commonwealth*, 58 Va. App. 66, 81 (2011) (quoting *Bailey*, 200 Va. at 96). "Excusable self-defense may be asserted when the accused, who was at some fault in precipitating the confrontation with the victim, abandons the fight and retreats as far as he or she safely can before attempting to repel the attack." *Lynn v. Commonwealth*, 27 Va. App. 336, 350 (1998).

The evidence is clear that Jackson was completely at fault in "bringing on the difficulty" when he aggressively and angrily confronted M.F. for speaking to Meade. *Cortez-Hernandez*, 58 Va. App. at 81. Contrary to Jackson's "concern," the camera footage from inside and outside the 7-Eleven captured M.F. and Meade interacting peaceably and amicably at all times. There was no evidence that Meade felt harassed, annoyed, or anxious, nor did she seek help from any of the many customers entering or exiting the store. Indeed, Meade was walking away from M.F., with M.F. remaining outside the store, when Jackson angrily confronted M.F. Moreover,

rather than appearing *concerned*, the evidence showed that Jackson was unbelievably angry as he loudly confronted M.F. to the extent that Barbrey yelled for someone to call the police.

The video footage then captured Jackson striking M.F. twice in the head before pulling his weapon from his pants and pointing it at M.F.'s face. When M.F. tried to move the gun away from his face, Jackson did not retreat ("as far as possible" or otherwise) or announce his desire for peace; instead, he took one step back, pointed his gun directly at M.F.'s head, and pulled the trigger. Crucially, Jackson admitted that he made no attempt to abandon the fight and retreat as far as he could. *See Lynn*, 27 Va. App. at 350 (holding that an excusable self-defense instruction was properly refused because there was no evidence supporting a finding that the appellant "retreated as far as he safely could under the circumstances"). Thus, even in the light most favorable to Jackson, the evidence does not support his theory of the case that he acted in self-defense.

Accordingly, because there was no evidence that Jackson made an attempt to retreat, he was not entitled to a self-defense instruction, and we cannot conclude that the circuit court erred by refusing one.

III. Motion *in Limine*

A circuit court's decision on the admissibility of evidence is reviewed for abuse of discretion. *Jackson v. Jackson*, 69 Va. App. 243, 247 (2018), *aff'd*, 298 Va. 132 (2019).

> An abuse of discretion can occur in three principal ways: when a relevant factor that should have been given significant weight is not considered; when an irrelevant or improper factor is considered and given significant weight; and when all proper factors, and no improper ones, are considered, but the court, in weighing those factors, commits a clear error of judgment.

*Kenner v. Commonwealth*, 299 Va. 414, 423 (2021) (quoting *Commonwealth v. Proffitt*, 292 Va. 626, 634 (2006)). "In evaluating whether a trial court abused its discretion, . . . 'we do not substitute our judgment for that of the trial court. Rather, we consider only whether the record fairly supports

- 14 -

the trial court's action.'" *Carter v. Commonwealth*, 293 Va. 537, 543 (2017) (alteration in original) (quoting *Grattan v. Commonwealth*, 278 Va. 602, 620 (2009)).

"The abuse-of-discretion standard [also] includes review to determine that the discretion was not guided by erroneous legal conclusions." *Id.* at 543-44 (alteration in original) (quoting *Porter v. Commonwealth*, 276 Va. 203, 260 (2008)). "Only when reasonable jurists could not differ can we say an abuse of discretion has occurred." *Lambert v. Commonwealth*, 70 Va. App. 740, 749 (2019) (quoting *Thomas v. Commonwealth*, 44 Va. App. 741, 753, *adopted upon reh'g en banc*, 45 Va. App. 811 (2005)). "That standard means that the circuit court judge's 'ruling will not be reversed simply because an appellate court disagrees.'" *Fields*, 73 Va. App. at 672 (quoting *Thomas*, 44 Va. App. at 753). In conducting this analysis, this Court views "the evidence in the light 'most favorable to the Commonwealth as the prevailing party on this issue in the circuit court.'" *Id.* (quoting *Grattan*, 278 Va. at 617).

Unless otherwise prohibited, "[a]ll relevant evidence is admissible." Va. R. Evid. 2:402(a). "'Relevant evidence' means evidence having any tendency to make the existence of any fact in issue more probable or less probable than it would be without the evidence." Va. R. Evid. 2:401. "The scope of relevant evidence in Virginia is quite broad, as '[e]very fact, however remote or insignificant, that tends to establish the probability or improbability of a fact in issue is relevant.'" *Proffitt*, 292 Va. at 634 (alteration in original) (quoting *Virginia Elec. & Power Co. v. Dungee*, 258 Va. 235, 260 (1999)). "Photographs, when properly authenticated, are, as a general rule, held to be admissible under two distinct rules—(1) to illustrate the testimony of a witness, and (2) as 'mute,' 'silent,' or 'dumb' independent photographic witnesses[.]" *Ferguson v. Commonwealth*, 212 Va. 745, 746 (1972) (quoting 29 Am. Jur. 2d *Evidence* § 785, p. 857).

Under Virginia Rule of Evidence 2:403(a)(i), relevant evidence may be excluded if "the probative value of the evidence is substantially outweighed by . . . the danger of unfair prejudice

. . . ." "All evidence tending to prove guilt is prejudicial to an accused, but the mere fact that such evidence is powerful because it accurately depicts the gravity and atrociousness of the crime or the callous nature of the defendant does not thereby render it inadmissible." *Powell v. Commonwealth*, 267 Va. 107, 141 (2004). The circuit court must determine whether "the probative value of the evidence [is] substantially outweighed by . . . the danger of *unfair* prejudice." *Lee v. Spoden*, 290 Va. 235, 251 (2015) (second alteration in original) (quoting Va. R. Evid. 2:403(a)(i)). To be considered "unfairly prejudic[ial]," evidence must "inflame the passions of the trier of fact, or . . . invite decision based upon a factor unrelated to the elements of the claims and defenses in the pending case." *Id.* "It is well-settled that '[t]he responsibility for balancing the competing considerations of probative value and prejudice rests in the sound discretion of the [circuit] court.'" *Walker v. Commonwealth*, 302 Va. 304, 320 (2023) (first alteration in original) (quoting *Ortiz v. Commonwealth*, 276 Va. 705, 715 (2008)). "[T]he mere fact that evidence is highly prejudicial to a party's claim or defense is not a proper consideration in applying the balancing test." *Lee*, 290 Va. at 252.

The circuit court admitted two photographs from Jackson's Instagram account depicting Jackson wearing the same distinctive belt buckle and necklace that the shooter wore. The circuit court also admitted the video surveillance from Plaza Azteca showing Jackson fondling Meade's breasts and handling his gun. At the time of trial, the Commonwealth bore the burden of "proving the identity of the accused as the perpetrator beyond a reasonable doubt." *Blevins v. Commonwealth*, 40 Va. App. 412, 423 (2003). When the evidence was admitted during the Commonwealth's case-in-chief, the Commonwealth purportedly did not know that Jackson would, through his testimony, admit that he committed the offenses. The photographs were therefore probative of Jackson's identity as the shooter and admissible for that purpose. Moreover, the camera footage from Plaza Azteca proved that Meade was Jackson's girlfriend, thus providing a

motive for why he angrily confronted M.F. for speaking to her. The footage also showed Jackson in possession of a firearm similar to the one used in the shooting.

The evidence was therefore relevant to establish certain elements of the offenses and important facts supporting the Commonwealth's theory of the case. Any incidental prejudice to Jackson in admitting the pictures and camera footage was outweighed by their probative value, as we find nothing particularly inflammatory about them. Thus, we find no error in the circuit court's ruling on Jackson's motion *in limine* to exclude the evidence.

## CONCLUSION

For the foregoing reasons, the circuit court's judgment is affirmed.

*Affirmed.*